[Civil No. 4226.   Filed February 3, 1941.]

[109 Pac. (2d) 845.]

N. H. RUBY, Appellant, v. UNITED SUGAR COMPANIES, S. A., a Corporation, Appellee.

Messrs. Cunningham & Carson, for Appellant.

Mr. Duane Bird and Mr. Thomas L. Hall, for Appellee.

LOCKWOOD, C. J.—This is an appeal by N. H. Ruby, hereinafter called plaintiff, from a judgment in favor of United Sugar Companies, S. A., a corporation, hereinafter called defendant. The undisputed facts are as follows:

On April 21, 1932, defendant was a corporation organized and existing under the laws of the Republic of Mexico, with its principal place of business at Los Mochis, Sinaloa, Republic of Mexico. It was the owner of a large amount of farming lands and engaged primarily in the business of producing sugar. As one of its properties it had an ice plant of small capacity which it used primarily for supplying the needs of its employees and other residents of the vicinity. At the same time the San Diego Fruit & Produce Company, hereinafter called the company, was a corporation organized and existing under the laws of California, with its principal place of business in San Diego, Cali-

fornia. On the date first mentioned and in the state of California it entered into a written contract with defendant, whereby it leased for three years certain lands of the latter in Sinaloa for the purpose of growing winter vegetables. Among other provisions of the contract was one that the company might improve, remodel and enlarge the ice plant above referred to, and that upon certain conditions it would eventually be reimbursed by defendant for the money used for that purpose. Pursuant to the provisions of the lease the company went into possession of the lands covered thereby, and expended in the remodeling, improvement and enlargement of the ice plant aforesaid a considerable sum. At the expiration of the three years it found that its operations in Mexico were unprofitable and ceased them. Knowing some time in advance of its intent to do so, on October 13, 1934, it made a written assignment to plaintiff of its right to recover whatever was due it under the lease for its improvement of the ice plant. A written notice of this assignment was given defendant on December 21, 1934, and no exception thereto was taken by the latter until after the filing of this suit. On April 22, 1935, plaintiff demanded of defendant a settlement of his claim, contending that he was entitled to the amount of money invested by the company in the ice plant aforesaid. Defendant insisted that no payments were due under the contract, but offered to permit plaintiff to remove from the plant any of the improvements which the company had placed thereon, and dispose of them as he saw fit. On May 8, 1935, this suit was commenced by plaintiff in the superior court of the state of Arizona, in and for Santa Cruz county, an affidavit and bond in garnishment filed, and a writ of garnishment issued and served upon the First National Bank of Nogales, hereinafter called garnishee, in Nogales, Arizona. On May 9th the gar-

nishee answered that it was indebted to defendant in the sum of $5,060, money of the United States, and 1935.18 pesos, Mexican money. On July 20, 1935, and before any service of process had been made upon it, defendant filed a special appearance and plea to the jurisdiction of the court. On July 25th it filed a motion to require plaintiff to give bond for security of costs. Plaintiff filed an opposing affidavit to this motion, and on August 23d the court denied the motion for security for costs. On the date last mentioned plaintiff filed an affidavit setting forth that defendant was a nonresident of the state of Arizona; that its principal place of business was at Los Mochis, Sinaloa, Republic of Mexico, and requesting that summons be served by publication and mail, which was ordered by the court, and the summons was so served. On February 4, 1936, the court overruled the special plea to the jurisdiction of the court. Thereafter defendant filed various motions to strike, to make more definite and certain, a demand for a bill of particulars, and answers to the original and amended complaint, in none of which was there any reservation as to defendant's special appearance and plea to the jurisdiction. The matter finally came on for trial before the court on November 13, 1936, and a great amount of evidence, written and oral, was presented by both sides, and the matter having been taken under advisement and finally determined, judgment was rendered on September 23, 1939, in favor of defendant, and after the usual motion for new trial was denied, this appeal was taken by plaintiff. No cross-appeal was taken by defendant nor were there any cross-assignments of error presented in this court.

██ The first question for our consideration is the jurisdiction of the court. It is admitted that the contract was executed by defendant and the company in the state of California, but it is urged that it was a

contract affecting real estate which was, by its terms, to be performed wholly within the Republic of Mexico, and for that reason it is governed by the law of that Republic, which, it is claimed by defendant, gives sole and exclusive jurisdiction to the courts thereof of any action arising out of the contract. Did the court have jurisdiction of the subject matter? While the contract in question was for a lease of lands in the Republic of Mexico, and the ice plant which was improved under the terms of the contract was located therein, the action itself is not for specific enforcement of such contract or of any provision thereof as affecting the realty, but is on a portion of the contract requiring the direct payment of money. Contracts for the payment of money are generally held to be transitory, and an action may be brought thereon in any court which has jurisdiction of actions of that nature and where proper service can be obtained upon the defendant. There can be no question that the superior court of the state of Arizona, in and for Santa Cruz county, had general jurisdiction of actions such as the present one. We think, therefore, the court had jurisdiction of the subject matter of this action.

The next question is as to the jurisdiction of person of defendant. It has been held repeatedly that although no personal service is made upon the defendant within the territorial jurisdiction of the court and he fails to appear or answer, yet constructive service is obtained sufficient to support a judgment to be satisfied out of the specific property within the jurisdiction of the court by proceedings in attachment and garnishment seizing such property, which is followed by service on a nonresident by publication, or otherwise, as provided by the statutes of the local forum. *Pennoyer* v. *Neff*, 95 U. S. 714, 24 L. Ed. 565; *Hook* v. *Hoffman*, 16 Ariz. 540, 147 Pac. 722; *Porter* v. *Duke,*

34 Ariz. 217, 270 Pac. 625. Was proper service made on defendant under the law of Arizona? Without going into the details of what is required by our statutes regarding service on nonresidents, we think it is evident from the records that these statutes were fully complied with and that the court had jurisdiction not only of the subject matter of the action but of the person of the defendant, so far at least as the fund attached is concerned. It is further true that after the special plea to the jurisdiction was denied, instead of standing upon it counsel proceeded to answer and to try the action on the merits without, so far as the record shows, even making any special reservation of his plea to the jurisdiction of the court. This constitutes a waiver of the objection. *Hobson* v. *New Mexico & Arizona Railroad Co.,* 2 Ariz. 171, 11 Pac. 545; *New Mexico & Arizona Railroad Co.* v. *Hobson,* 127 U. S. 795, 32 L. Ed. 331. We hold, therefore, that the superior court had jurisdiction of both the subject matter of the action and of the person of defendant.

██ We do not consider the question of whether the contract was valid under the laws of Mexico material, for it was admittedly made in California, and its validity is determined by the rule of *lex loci contractus* when it does not appear that the parties intended otherwise, as in the present case. *Forgan* v. *Bainbridge,* 34 Ariz. 408, 274 Pac. 155. It must be remembered that this is an action to recover money as agreed on, and not for specific performance of covenants affecting realty. There is no evidence that the law of California as to such a contract is any different from that of Arizona, and we must, therefore, consider it as if made in this state.

The next question is whether plaintiff was a proper party to maintain the action. It is urged by defendant that there were two other causes of action for

breach of the contract involved herein pending, which had not been assigned by the company to plaintiff, and the cause of action in the present case is not properly severable therefrom and cannot be assigned alone. They are (a) the division of the profits of the ice plant during its operation, and (b) damages for trespass of some of defendant's cattle upon the land leased by plaintiff.

We have discussed the question of severability of a contract in the case of *Waddell* v. *White,* 51 Ariz. 526, 78 Pac. (2d) 490, 496. Therein we said:

" . . . As a general rule it may be said that a contract is entire when, by its terms, nature, and purpose, it contemplates and intends that each of its parts and the consideration should be common each to the other and interdependent, while a severable contract is one which in its nature and purpose is susceptible of division and apportionment, having two or more parts in respect to matters and things contemplated and embraced by the contract which are not necessarily dependent upon each other, nor is it intended by the parties that they shall be. Primarily, the question of whether a contract is entire or severable is one of intention, which intention is to be determined by the language which the parties have used and the subject matter of the agreement. A contract may both in its nature and by its terms be severable, and yet rendered entire by the intention of the parties. We think that perhaps the best test is whether all of the things, as a whole, are of the essence of the contract. That is, if it appeared that the purpose was to take the whole or none, then the contract would be entire; otherwise, it would be severable. *Wooten* v. *Walters,* 110 N. C. 251, 14 S. E. 734, 736. The divisibility of the subject matter, or the apportionment of the consideration, while they are both items to consider in determining whether a contract is entire or severable, are not conclusive."

Let us examine these three alleged causes of action in the light of the contract itself. The latter, so far as material to this case, reads as follows:

"This Agreement, . . . between United Sugar Companies, S. A., of Los Mochis, Sinaloa, Mexico, . . . party of the first part, and San Diego Fruit & Produce Company, . . . party of the second part.

"Witnesseth:

"That the party of the first part hereby leases and rents to the party of the second part the following described real estate situate in the Municipality of Ahome, Sinaloa, Mexico, to-wit: (Description of land follows). . . .

"This lease and the rental contract shall extend for a period of three (3) years from date hereof. . . .

"It is also agreed as to the rental for the said three year period of said eight hundred (800) acres, the party of the second part shall pay to the party of the first part Twelve Thousand Dollars ($12,000.00). . . .

"It is further agreed that the ice plant owned by the party of the first part, valued at approximately Sixty Thousand Dollars ($60,000.00) may be added to or increased in size by the party of the second part, so that its storage capacity will furnish the space desired and the ice required by the party of the second part, and that this alteration and addition may be made when and in such proportion as the party of the second part shall deem best, and at its expense.

"It is further agreed that the profit if any derived from the sale of ice from said plant, shall be pro-rated between the parties hereto according to the investment of each of the parties hereto therein.

"It is further agreed that if and when the party of the second part shall terminate this lease or cease to do business under this contract, then and in that event, the party of the first part shall repay to the party of the second part forthwith, in gold or its equivalent, the present worth at that time of the investment of the party of the second part in said ice plant, at the expiration of three years or later.

" . . .

"It is further agreed that the party of the first part shall operate the ice plant as in the past, and will operate the same as efficiently as possible and at a cost proportionately the same as heretofore, which cost shall in no event exceed that of the past.

" . . . Except as to the retail sale of ice, the entire supply of ice manufactured in said ice plant shall be available to the party of the second part up to the requirements of the said party of the second part. . . .

"It is further agreed that if any part of this contract shall be held or construed to be invalid, then that invalidity shall not affect the balance of the contract."

It will be seen by the provisions of the contract that there were several different subject matters thereof (a) a lease of certain real estate, the consideration for which was $12,000 of rental; (b) the improvement by the company of the existing ice plant, the consideration for which was the repayment by defendant of certain sums of money and the prior right of the company to the use of ice produced by defendant in the plant; (c) a division of the profits of the ice business, the consideration for which was the mutual contributions to the business made by the company and defendant. The parties also obviously intended that the contract should be severable because of the provision that if any part thereof were invalid that invalidity should not affect the balance of the contract. We are of the opinion, therefore, that the repayment on account of investment in the new ice plant was entirely severable from the division of profits during its operation. The claim for damages from trespass of the cattle, although it would not have arisen had there been no lease, was certainly a tort which was entirely severable. We hold, therefore, that plaintiff was entitled to maintain his action on his assignment, notwithstanding the fact the assignment did not carry with it any right of action which the company might have had to a division of the profits of the ice business, or for damages for trespass of cattle.

We come then to the vital question on the merits, which is a determination as to just what defendant agreed to do, if anything, in regard to the repayment

of the amount invested by the company in the ice plant. The particular clause on which this determination must be made reads as follows:

"It is further agreed that if and when the party of the second part shall terminate this lease or cease to do business under this contract, then and in that event, the party of the first part shall repay to the party of the second part forthwith, in gold or its equivalent, the present worth at that time of the investment of the party of the second part in said ice plant, at the expiration of three years or later."

■ The meaning of the clause was, of course, a question of law for the court. Four theories have been advanced during the progress of the case as to what the company was entitled to thereunder: (a) plaintiff at the inception of the action claimed that it was entitled to recover the entire amount which it had expended in the improvement of the plant; (b) defendant urged that all it was entitled to was the value of the physical additions to the plant as of the time of termination of the contract when and if they were severed from the original plant; (c) the trial court apparently held that it was the difference between the value of the plant at the time of the beginning of the contract and any increased value which it had when the contract had terminated, in both cases as a going concern; and (d) plaintiff on this appeal contends that it is the proportionate values of the amount contributed by defendant to the improvement of the plant, and the worth of the existing plant at the beginning of the lease as applied to the total value of the plant as it was when the lease was terminated.

We think it is clear that the construction given to the contract by plaintiff at the inception of the action cannot be sustained. The language "present worth at that time of the investment of the party of the second part" negatives the idea that the company was

entitled to receive its initial investment, without any variation. Nor do we think defendant's position is any more tenable. The contract shows that the amount contributed by the company was to be used in the improvement and development of an existing and going business and that the improvements thus made could not at the end of the lease be severed from that business so that they would have any value at all except as junk. Nor was the agreement to pay the value of the property as severed, but of the "investment made," which clearly implies a valuation of the contribution by the company as an integral part of a going concern.

██ There remains only the position adopted by the trial court and that contended for by plaintiff on the appeal. We think the choice between these two theories depends upon whether the defendant and the company were joint adventurers in the project for the improvement of the ice plant. If they were, the rule now urged by plaintiff is undoubtedly the correct one. If they were not, the construction of the trial court was proper. A joint adventure may be defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation." Schouler Pers. Prop., 5th ed., sec. 167a; 33 C. J. 841. It differs from a copartnership principally in that while a copartnership is usually formed for the transaction of a general business of a particular kind, a joint adventure is usually, but not necessarily, limited to a single transaction, although the business of conducting it may continue for a number of years. 33 C. J. 842.

██ Let us examine the nature of the relationship set up by the contract. So far as the leased land was concerned, it was only that of landlord and tenant. Defendant had no interest in nor power over the op-

erations of the company. All it was entitled to was to receive the agreed rent. But when it came to the improvement and operation of the ice plant, the situation was very different. It was originally a going concern not necessary to the conduct of the principal business of defendant, but a separate side issue conducted by it for profit. On the other hand, it was necessary that the company, in the conduct of its business, have a definite and regular source for the ice it necessarily used. It might have built its own plant for that purpose, with no relationship whatever to the defendant, or it might have made an arrangement with defendant to purchase ice from the latter at a fixed price and in fixed quantities, leaving it to defendant to decide how it would produce the ice. The parties chose neither of these courses. They took the existing ice plant of defendant as the basis, agreed that it should be operated as before by the latter, but provided that the company might contribute whatever sum it pleased to the enlargement of the plant, and that if any profits were made out of its operations, such profits should be divided between plaintiff and defendant, in proportion to their contributions to the plant, and that when the lease was terminated, defendant would buy back from plaintiff its interest in the plant at a determinable price. We think it is clear, so far as the ice plant was concerned, the contract provided for a joint adventure upon conditions set up therein, with the duty imposed upon one of the adventurers to purchase the interest of the other at a fixed time and upon terms set forth in the contract. This necessarily required a determination of the value of the investment of the company in the joint adventure when it was to be purchased by defendant. The ordinary rule for ascertaining the present worth or the interest of joint adventurers in the assets remaining of the adventure at its termination is a division of those assets in pro-

portion to the original contributions by each of the adventurers. The evidence and the judgment show that this rule was not followed by the trial court. Its judgment was based on the theory that since the total value of the ice plant as a going concern under the circumstances existing at the termination of the contract was no greater than it was at the inception of the contract, the present worth of the investment of the company was nothing. The true rule is that the present worth was the proportionate share of the value of the ice plant at the termination of the contract based upon the respective contributions thereto of the defendant and the company. If there was a larger amount invested by the two parties than the property was worth at the end of the contract, then each must bear his proportionate share of the loss, just as if, due to various circumstances, the venture had been so profitable that the value of the plant as a going concern at the end of the adventure was much greater than the total contributions by the adventurers, they would have shared in the profit proportionately.

The only other material question is the defense of fraud. It is enough to say that the most the evidence justifies is a suspicion of the possibility of fraud. This is not sufficient to sustain such a defense. 27 C. J. 63, and cases cited.

The judgment of the trial court is reversed and the case remanded for a new trial in accordance with the principles laid down herein.

McALISTER and ROSS, JJ., concur.